# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

CHRISTI J. KOPP et al.,
Defendants and Appellants.

S257844

Fourth Appellate District, Division One
D072464

San Diego County Superior Court
SCN327213

December 29, 2025

Justice Corrigan authored the opinion of the Court, in which Acting Chief Justice Evans and Justices Liu, Kruger, Groban, and Jenkins[*] concurred.

Justice Liu filed a concurring opinion, in which Acting Chief Justice Evans concurred.

---

[*]     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Justice Rothschild† filed a concurring and dissenting opinion.

---

† Presiding Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. KOPP

S257844


Opinion of the Court by Corrigan, J.


We granted review to resolve a divergence among the Courts of Appeal regarding court-ordered financial obligations imposed on criminal defendants. Specifically, this case challenges various punitive fines, along with other ancillary costs, ordered as part of a criminal sentencing. We hold that a challenge to the amount of a criminal fine should initially be reviewed under the excessive fines provisions of the United States and California Constitutions.

Conversely, as discussed below, the imposition of ancillary payments raises separate equal protection issues. Accordingly, upon request, a court must consider a defendant's inability to pay before imposing a court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)) or a court facilities assessment (Gov. Code, § 70373, subd. (a)(1)). Although our holding resolves the orders in this particular case, we urge the Legislature to revisit issues surrounding court-ordered ancillary payments in criminal cases and address them in a more comprehensive manner.

## I. BACKGROUND

### A. *Facts and Procedure*

Defendant Jason Hernandez was a leader in the Varrio Fallbrook Locos gang and conceded on appeal he was also a Mexican Mafia member. (*People v. Kopp* (2019) 38 Cal.App.5th 47, 57, 70 (*Kopp*).) Expert testimony established that a member

of his stature would be "at the very top of the Mexican Mafia hierarchy and considered to be a 'shot caller' who was in charge and could order executions . . . ." (*Id*. at p. 71.) Codefendant Christi J. Kopp[1] was a secretary in the Mexican Mafia, described as "someone who transmits information and money to and from" incarcerated gang members. (*Id*. at p. 57, fn. 3.) In December 2013, defendant and Kopp met with U.P., an affiliate of both gangs, to discuss a plan to sell methamphetamine. A.C. was also present. When Hernandez accused A.C. of owing money to the gang, she denied it and left the meeting. Hernandez and another gang associate followed and assaulted her, stabbing her in the head and neck. Hernandez also punched and kicked her, breaking several of her facial bones. After both assailants fled, U.P. called the police. (See *id*. at pp. 57–58.)

Thereafter, defendant, using intermediaries including Kopp, tried to persuade A.C. not to testify against him and to arrange for the murder of U.P. In recorded statements, defendant admitted his role in the stabbing. At a joint trial, Kopp confirmed the murder plot and admitted she paid the would-be assassin. Kopp is not a party to our review.

Hernandez was convicted by jury of assault with a deadly weapon and by force likely to produce great bodily injury,

---

[1] Hernandez and Kopp were tried together. The jury convicted Kopp of furnishing a controlled substance and conspiracies to commit murder and to dissuade a witness. (Pen. Code, §§ 136.1, 182, subd. (a), 187; Health & Saf. Code, § 11379, subd. (a).) The Court of Appeal reversed her witness tampering conviction due to instructional error and remanded for resentencing and further proceedings addressing various fines and ancillary costs. (See *Kopp, supra*, 38 Cal.App.5th at pp. 85–88, 98.) We denied Kopp's petition for review, which did not seek to challenge the fines and costs orders.

conspiracy to commit murder, and conspiracy to dissuade a witness,[2] along with other crimes and enhancements.[3] He waived jury on the prior conviction allegations. The court found he had suffered two felony convictions for voluntary manslaughter and had served a term in state prison.[4] It then imposed a sentence of 50 years to life plus 31 years.

At the sentencing hearing, Hernandez's counsel asked the court to impose a minimum restitution fine and stay any additional payment orders "due to [Hernandez's] inability to pay." The court denied the request, stating: "My general understanding is the determination of inability to pay occurs not necessarily on the date of sentencing but at a later date when the fine is or may be imposed. There is a possibility that the defendant may be able to earn funds while he is incarcerated, so I'm going to decline to make that finding at this time." The court imposed various fines and ancillary costs. (See discussion *post*.)

On appeal, Hernandez challenged the monetary orders because the court did not first find he had an ability to pay them. The Court of Appeal majority held the trial court should have considered whether Hernandez had the ability to pay before imposing ancillary costs but rejected his claim that such a

---

[2]    See Penal Code sections 245, subdivision (a)(1), (4), 182, subdivision (a)(1), 187, 136.1.

[3]    The jury additionally convicted defendant of furnishing a controlled substance and found true enhancements for personally inflicting great bodily injury and committing crimes to benefit a street gang. (See Health & Saf. Code, § 11379, subdivision (a); Pen. Code, §§ 186.22, subd. (b), 12022.7, subd. (a).)

[4]    Penal Code sections 192, subdivision (a), 667, subdivision (a), 1170.12, 667.5, subdivision (b).

finding was required as to fines. It clarified, however, that defendant could challenge the fines under the federal and state constitutional excessive fines clauses. (See *Kopp, supra*, 38 Cal.App.5th at pp. 93–98.) The matter was remanded for resentencing[5] and further proceedings as to the imposed fines and ancillary costs. We granted Hernandez's petition for review.

## B. *Statutory Framework*

A person convicted of a crime can, and in some cases must, be ordered to pay a variety of punitive fines along with other nonpunitive ancillary costs. Some statutes require the imposition of fines and ancillary costs regardless of a defendant's ability to pay. Other statutes require a finding of the ability to pay or allow for its consideration. As he did below, Hernandez challenges all his court-ordered payments because the court did not consider whether he had the ability to pay them.

In considering this challenge, it is important to distinguish among the variety of payments commonly imposed at sentencing, which fall into three broad categories: fines, ancillary costs, and victim restitution. These will be referred to collectively as "court-ordered payments."

---

[5] As with Kopp, the Court of Appeal reversed Hernandez's conviction for conspiracy to dissuade a witness. The court also remanded the matter so he could seek dismissal of the prior conviction enhancement under a new law granting a sentencing court discretion to do so. (See Stats. 2018, ch. 1013, §§ 1, 2; Pen. Code, §§ 667, subd. (a), 1385; *Kopp, supra*, 38 Cal.App.5th at pp. 85–88, 92–93.)

The requirement of monetary payments to punish criminal offenses is a practice long predating the nation's founding. Both the federal and state constitutions prohibit excessive fines.[6] Statutory provisions, spread out over different codes, define criminal offenses and authorize fines as punishment. "Criminal fines . . . are penalties inflicted by the sovereign for the commission of offenses." (*Southern Union Co. v. United States* (2012) 567 U.S. 343, 349; see *United States v. Bajakajian* (1998) 524 U.S. 321, 327–328 (*Bajakajian*); *People v. Alford* (2007) 42 Cal.4th 749, 757 (*Alford*).) In addition to any jail or prison time, the amount of an applicable fine is established by statute. Fines and/or incarceration may also be imposed as conditions of probation. (Pen. Code, § 1203.1, subd. (a).)

In contrast to punitive fines, ancillary costs are generally not intended to punish the commission of a crime. Instead, they are funding mechanisms, created by the Legislature, to reimburse governmental agencies for expenditures or to otherwise fund a broad assortment of services. (See *People v. Ruiz* (2018) 4 Cal.5th 1100, 1107–1109 (*Ruiz*); *Alford, supra*, 42 Cal.4th at pp. 755–757.) Statutory language authorizing payment of ancillary costs is not always employed consistently. A provision may variously refer to them as "fines," "fees," "assessments," or "costs." Here we clarify that the label employed is not dispositive of whether a particular payment

---

[6] The Eighth Amendment of the federal Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Our state Constitution similarly states: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.)

qualifies as a punitive fine, as opposed to some kind of fundraising assessment. The term "fine" is properly understood as a payment imposed as punishment for criminal conduct. As discussed below, the distinction between punitive fines and other imposed payments is important because it impacts whether a given form of required payment is initially challenged under, and then reviewed under, the constitutional excessive fines clauses, or under the constitutional provision for equal protection.[7] Hereafter we use the term "fine" to refer to a legislatively provided punishment following a criminal conviction.

Finally, crime victims have a state constitutional right to "secure restitution from the persons convicted of the crimes causing the losses they suffer." (Cal. Const., art. I, § 28, subd. (b)(13)(A).) Direct victim "[r]estitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss." (Cal. Const., art. I, § 28, subd. (b)(13)(B); see Pen. Code, § 1202.4, subd. (f).) A court may also impose victim restitution as a condition of probation. (Pen. Code, § 1203.1, subd. (b).)

We now turn to the court-ordered payments in this case.

### 1. Fines

The court ordered Hernandez to make a variety of payments. These included a $50 criminal laboratory analysis "fee" (lab fee) (Health & Saf. Code, § 11372.5, subd. (a)), and a $150 drug program "fee" (Heath & Saf. Code, § 11372.7, subd.

---

[7] In making this distinction, we do not intend to foreclose other challenges that may be put forward based on the facts of a given case.

(a)).  The payment of the lab fee is mandatory.  (See *People v. Martinez* (1998) 65 Cal.App.4th 1511, 1519.)  However, by statute, the court must determine whether a defendant has the ability to pay the drug program fee before imposing it.  (Health & Saf. Code, § 11372.7, subd. (b).)

Although these drug-related impositions are called "fees," we have recognized that the Legislature "understood and intended that the payments these sections prescribe are fines, penalties, and punishment."  (*Ruiz, supra,* 5 Cal.5th at p. 1116.)  In addition, these impositions were subject to various penalty assessments and surcharges applicable to many fines.[8]  In

---

[8]  The six penalty assessments and charges imposed were: 1. A "state penalty in the amount of ten dollars ($10) for every ten dollars ($10), or part of ten dollars ($10), upon every fine, penalty, or forfeiture imposed and collected by the courts for all criminal offenses" (Pen. Code, § 1464, subd. (a)(1)); 2. A "state court construction penalty, in the amount of five dollars ($5) for every ten dollars ($10), or part of ten dollars ($10), upon every fine, penalty, or forfeiture imposed and collected by the courts for all criminal offenses" (Gov. Code, § 70372, subd. (a)(1)); 3. A county penalty "in the amount of seven dollars ($7) for every ten dollars ($10), or part of ten dollars ($10), upon every fine, penalty, or forfeiture imposed and collected by the courts for all criminal offenses" (Gov. Code, § 76000, subd. (a)(1)); 4. A penalty "supporting emergency medical services . . . in the amount of two dollars ($2) for every ten dollars ($10), or part of ten dollars ($10), upon every fine, penalty, or forfeiture imposed and collected by the courts for all criminal offenses" (Gov. Code, § 76000.5, subd. (a)(1)); 5. "[F]or the purpose of implementing the DNA Fingerprint, Unsolved Crime and Innocence Protection Act (Proposition 69) . . . there shall be levied an additional penalty of one dollar ($1) for every ten dollars ($10), or part of ten dollars ($10), in each county upon every fine, penalty, or forfeiture imposed and collected by the courts for all criminal

defendant's case, the assessments and surcharges added $155 to the lab fee and $465 to the drug program fee, raising the total drug-related penalty obligation from $200 to $820. These additional impositions are likewise properly understood as fines. (See *People v. Batman* (2008) 159 Cal.App.4th 587, 590–591; *People v. High* (2004) 119 Cal.App.4th 1192, 1197–1199.)

The court also imposed a $10,000 "restitution fine." (Pen. Code, § 1202.4, subd. (b)(1).) A restitution fine is distinguished from orders that restitution be made to a victim or to the state's Restitution Fund. (See *infra*, pp. 11–12.) A restitution *fine* under section 1202.4 constitutes punishment. (*People v. Hanson* (2000) 23 Cal.4th 355, 360–363.) It is required in "every case where a person is convicted of a crime" unless the court "finds compelling and extraordinary reasons for not doing so and states those reasons on the record." (Pen. Code, § 1202.4, subd. (b).) For felony convictions, the required fine is not less than $300 and not more than $10,000. (Pen. Code, § 1202.4, subd. (b)(1).)[9]

By statute, "[a] defendant's inability to pay [the minimum $300 fine] shall not be considered a compelling and extraordinary reason not to impose a restitution fine." (Pen.

---

offenses" (Gov. Code, § 76104.6, subd. (a)(1)); and 6. A DNA Identification Fund penalty "of four dollars ($4) for every ten dollars ($10), or part of ten dollars ($10), in each county upon every fine, penalty, or forfeiture imposed and collected by the courts for all criminal offenses" (Gov. Code, § 76104.7, subd. (a)). Additionally, a "state surcharge of 20 percent shall be levied on the base fine used to calculate the state penalty assessment" (Pen. Code, § 1465.7, subd. (a)).

[9] A restitution fine is not subject to state and county penalty assessments or the state surcharge. (Pen. Code, § 1202.4, subd. (e).)

Code, § 1202.4, subd. (c).) However, an inability to pay may be considered when "increasing the amount of the restitution fine in excess of the minimum" amount. (*Ibid*.) A defendant "shall bear the burden of demonstrating the defendant's inability to pay." (Pen. Code, § 1202.4, subd. (d).) The trial court declined Hernandez's request to impose the minimum amount and instead ordered the maximum fine of $10,000.

Finally, "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole," the court must impose a parole revocation restitution fine (hereafter "parole revocation fine") in the same amount as the restitution fine. (Pen. Code, § 1202.45, subd. (a).) However, this fine "shall be suspended unless the person's parole . . . is revoked." (Pen. Code, § 1202.45, subd. (c)). The court imposed and stayed a $10,000 parole revocation fine as required. This fine has remained stayed as Hernandez continues to serve his prison term.[10]

### 2. Ancillary Costs

Hernandez was also ordered to pay three ancillary costs. First, a county may collect a fee from a city or other district when an officer of that city or district brings an arrested person "to the county jail for booking or detention." (Gov. Code, § 29550, subd. (a)(1).) This fee is elsewhere referred to as a criminal justice administration fee, colloquially known as a "booking" fee. (*People v. McCullough* (2013) 56 Cal.4th 589, 592; see *Kopp*, *supra*, 38 Cal.App.5th at p. 94; Gov. Code, former § 29550.1,

---

[10] Although Hernandez makes no specific argument regarding the parole revocation fine, a successful challenge to the restitution fine would also alter the imposition of the parole revocation fine.

subd. (a).) In turn, under the law in effect at the time of sentencing, the city or district was entitled to recoup the county's booking fee "from the arrested person if the person is convicted of any criminal offense related to the arrest." (Gov. Code, former § 29550.1, subd. (a).) The imposition of the booking fee was mandatory and "issued on the order in the same manner as a judgment in a civil action, but the order shall not be enforceable by contempt." (*Ibid.*) Accordingly, the court imposed a booking fee of $154. (See San Diego County Code of Reg. Ord., § 34.103.) We have recognized a booking fee "is not 'punishment' for constitutional purposes." (*McCullough*, at p. 598.) The Court of Appeal did likewise. (*Kopp*, at p. 95).

The second and third ancillary costs are authorized to fund court facilities and operations. The court ordered a court operations assessment of $40 for each of the three unstayed counts, for a total of $120. (Pen. Code, § 1465.8, subd. (a)(1).)[11] The court also ordered a court facilities assessment[12] of $30 for each of the same three counts, totaling $90. (Gov. Code, § 70373, subd. (a)(1).) Both costs are mandatory. (Pen. Code, § 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1).) Case law establishes that these costs do not constitute punishment. (See *Alford*, *supra*, 42 Cal.4th at pp. 757–759; *People v. Knightbent* (2010) 186 Cal.App.4th 1105, 1111–1112; see also *Kopp*, at p. 95.)

---

[11]  Courts, including the Court of Appeal below, have referred to this operations assessment as a "court security fee." (*Kopp*, *supra*, 38 Cal.App.5th at p. 94; see *Alford*, *supra*, 42 Cal.4th at p. 752.)

[12]  The Court of Appeal referred to this assessment as "an immediate critical needs account fee . . . ." (*Kopp*, *supra*, 38 Cal.App.5th at p. 94.)

### 3. *Victim Restitution*

Restitution compensates crime victims for economic loss caused by an offense. Penal Code section 1202.4, subdivision (a)(1) provides: "It is the intent of the Legislature that a victim of crime who incurs an economic loss as the result of the commission of a crime shall receive restitution directly from a defendant who committed that crime." "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order . . . ." (Pen. Code, § 1202.4, subd. (f).) "An order of restitution to a victim is not a penal consequence"[13] (*In re I. M.* (2005) 125 Cal.App.4th 1195, 1210), and the statute expressly provides that "[a] defendant's inability to pay shall not be a consideration in determining the amount of a restitution order" (Pen. Code, § 1202.4, subd. (g)). (See also *People v. Harvest* (2000) 84 Cal.App.4th 641, 650.)[14] If a crime victim has received

---

[13]     The case of *Ellingburg v. United States* (8th Cir. 2024) 113 F.4th 839, cert. granted, No. 24–482, April 7, 2025, ___ U.S. ___ [145 S.Ct. 1899, 221 L.Ed.2d 645]) is currently pending before the high court. It will decide whether restitution under the federal Mandatory Victim Restitution Act (18 U.S.C. § 3663) constitutes punishment for purposes of applying the ex post facto clause (U.S. Const., art. I, § 9).

[14]     Subject to some restrictions, the court may order that funds confiscated at the time of a defendant's arrest be applied to satisfy a restitution order. (Pen. Code, § 1202.4, subd. (f).) The statute sets forth various provisions regarding the conduct of a hearing to determine the amount of restitution, what types of losses may be reimbursed, who may constitute victims, and the distribution of collected funds. (Pen. Code, § 1202.4, subds. (f)–(k).) Orders for reimbursement from a defendant to the

monetary assistance from the state's Restitution Fund (Gov. Code, § 13950 et seq.), upon a defendant's conviction, "the amount of assistance provided shall be presumed to be a direct result of the defendant's criminal conduct and shall be included in the amount of the restitution ordered" (Pen. Code, § 1202.4, subd. (f)(4)(A)). A restitution order "shall be enforceable as if the order were a civil judgment" (Pen. Code, § 1202.4, subd. (i)). A victim restitution order is neither a fine nor an ancillary cost. It is also different from an order to pay a restitution *fine*, as described *ante*. The trial court here did not order Hernandez to pay victim restitution.

### 4. Recent Legislative Action

In recent years, the Legislature has paid considerable attention to statutes imposing fines and costs on criminal defendants. In 2019, it passed Assembly Bill No. 927 (2019–2020 Reg. Sess.) (Assembly Bill No. 927), but the enactment was vetoed. It would have added section 19.5 to the Penal Code, stating: "Except for an order of victim restitution, whenever a provision of this code or any other law requires or authorizes imposition of a fine, fee, or assessment related to a criminal or juvenile proceeding involving a misdemeanor or felony, prior to imposition, the court shall make a finding, based on a contested hearing or on stipulation of counsel, that the defendant or minor has the ability to pay." (Assembly Bill No. 927, § 1.) The statute would have defined ability to pay as "the overall capability of the defendant or minor to pay the court-ordered fines, fees, and assessments, or a portion thereof, without undue hardship."

---

Restitution Fund are considered part of an order of restitution to the victim and are different from an order to pay a punitive restitution fine. (Pen. Code, § 1202.4, subd. (f)(4)(A).)

(*Ibid.*)  It would also have created a presumption of an inability to pay under certain circumstances, enumerated certain criteria for determining ability to pay, and placed on the prosecution the burden of rebutting any statutory presumption of an inability to pay.  (See *ibid.*)

The governor vetoed this bill, stating in his message:  "I support this bill's intent.  We must tackle the issue of burdensome fines, fees and assessments that disproportionately drag low-income individuals deeper into debt and away from full participation in their communities.  However, I do not believe that requiring a hearing on defendants' ability to pay is the best approach in every case.  [¶]  There are many ongoing conversations about how we can build a fairer criminal justice system while ensuring adequate funding for courts and victims' compensation.  I believe this issue needs to be tackled in a comprehensive manner, through the budget process, and I am committed to working with the Legislature and stakeholders on ensuring this gets done."  (Governor's veto message to Assem. on Assem. Bill No. 927 (Oct. 14, 2019) 14 Assem. J. (2019–2020 Reg. Sess.) p. 3651.)

Following the veto, the Legislature passed Assembly Bill No. 1869 (2019–2020 Reg. Sess.) (Assembly Bill No. 1869), which eliminated certain fees and rendered previously imposed fees uncollectible.  The Legislature stated its intent was "to eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and to eliminate all outstanding debt incurred as a result of the imposition of administrative fees."  (Stats. 2020, ch. 92, § 2.)  The bill added Government Code section 6111, which provides that, on July 1, 2021, a cost previously imposed on defendants for the booking fee or for the reimbursement of court-

appointed counsel "is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a); see Stats. 2020, ch. 92, § 11; Gov. Code, former §§ 27712, 29550.1 et seq.)  The Governor signed this bill, which went into effect in September 2020.

The same bill also added Penal Code section 1465.9, a similar provision covering various enumerated fees in the Penal Code, which are not at issue here.  (See Stats. 2020, ch. 92, § 62; Stats. 2022, ch. 57, § 21; Stats. 2021, ch. 257, § 35.)  However, section 1465.9 has since been amended to provide that, "[u]pon the expiration of 10 years after the date of imposition of a restitution fine pursuant to Section 1202.4, the balance, including any collection fees, shall be unenforceable and uncollectible and any portion of a judgment imposing those fines shall be vacated."  (Pen. Code, § 1465.9, subd. (d); Stats. 2024, ch. 805, § 1.)

Under Government Code section 6111, subdivision (a), any unpaid portion of the $154 booking fee imposed on Hernandez is no longer enforceable, and "any portion of a judgment imposing those costs shall be vacated."  Accordingly, the judgment here is modified to vacate any portion of the judgment imposing the booking fee which remains unpaid.  (See *People v. Johnson* (2022) 79 Cal.App.5th 1093, 1115–1116; *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 950–954.)

We also vacate any unpaid portion of the restitution fine under Penal Code section 1465.9, subdivision (d).  However, as noted, a parole revocation fine is still required and set in the same amount as the restitution fine.  (Pen. Code, § 1202.45, subd. (a).)  To set the proper amount of the parole revocation fine, the court on remand must determine what amount the

restitution fine would have been.  This consideration includes a defendant's inability to pay any fine in excess of the minimum $300.  (Pen. Code, § 1202.4, subds. (c), (d); see discussion *post*.)

## II.  DISCUSSION

### A.  *Introduction*

Before we address defendant's claims, we should be clear as to the fines and ancillary costs actually at issue here.  It is undisputed that some of the statutes already require or allow consideration of an ability to pay.  As discussed, the $150 drug program "fee" can only be imposed upon a finding of an ability to pay (Health & Saf. Code, § 11372.7, subd. (b)), which would also impact the $465 of attached penalty assessments.  Statutory authorization of any restitution fine above the minimum of $300 allows consideration of any relevant factor, including inability to pay (Pen. Code, § 1202.4, subd. (d)), which impacts the amount of the stayed parole revocation fine set at the same amount as the restitution fine.  (Pen. Code, § 1202.45, subd. (a).)  Further, as discussed, we vacate the unpaid portions of the booking fee and restitution fine in light of recently enacted legislation.  Thus, our discussion is limited to those impositions that are mandatory without consideration of an ability to pay: the $50 lab fee (with attached $155 of penalty assessments), and the $40 court operations and $30 court facilities assessments, multiplied by defendant's three unstayed offenses.  These unstayed amounts total $415.

### B.  *Fines*

Defendant, making no distinction between fines and ancillary costs, contends principles of due process and equal protection forbid a court from ordering payment of any financial obligation without first finding a defendant has an ability to pay.

Although all such obligations are paid to the state, we analyze fines and ancillary costs separately because different justifications support each, and different constitutional protections apply. As we have observed, "[i]t is both the prerogative and the duty of the Legislature [or the electorate] to define degrees of culpability and punishment, and to distinguish between crimes in this regard." (*People v. Turnage* (2012) 55 Cal.4th 62, 74 (*Turnage*); see *People v. Wilkinson* (2004) 33 Cal.4th 821, 840 (*Wilkinson*).) By contrast, requiring payment of ancillary costs does not fall under the legislative responsibility to determine punishment but instead reflects an intent to recoup particular costs or raise funds for specific purposes. In light of these differing justifications, we analyze fines separately from ancillary costs, addressing fines in this section and ancillary costs in the next.

Here, in an attempt to bring his fine challenges under due process and equal protection review, defendant relies on a series of high court cases beginning with *Griffin v. Illinois* (1956) 351 U.S. 12. Those cases are distinguishable on this point. In *Griffin*, the United States Supreme Court struck down a law requiring criminal defendants to pay for a trial transcript, or its equivalent, before they could appeal a conviction. In doing so, the high court held that the inability to pay costs in advance could not be used to bar a defendant's challenge that his trial was unfair. (*Id.* at pp. 17–18.) Similarly, it reasoned that, in an appellate context, "to deny adequate review to the poor means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside." (*Id.* at p. 19.) As a matter of due process and equal protection, "[d]estitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy

transcripts." (*Ibid.*) While *Griffin* did not require the state to provide a full transcript if a defendant could not pay for one, it did require, at a minimum, that the state "find other means of affording adequate and effective appellate review to indigent defendants." (*Id.* at p. 20.)

The Supreme Court later applied *Griffin* to circumstances that limited an indigent's access to other trial or appellate remedies. For example, it clarified that indigent defendants are entitled to a free transcript, or its equivalent, for purposes of appealing a denial of habeas corpus (*Long v. District Court of Iowa* (1966) 385 U.S. 192, 194–195) or for filing a subsequent habeas petition in in lieu of an appeal (*Gardner v. California* (1969) 393 U.S. 367, 368–371), and to pursue an appeal from a criminal violation of a city ordinance (*Williams v. Oklahoma City* (1969) 395 U.S. 458, 458–460) or a nonfelony fine-only offense (*Mayer v. Chicago* (1971) 404 U.S. 189, 195–199). Cases have likewise applied *Griffin*'s reasoning to filing fees themselves, concluding that an indigent defendant could not be required to pay a filing fee in order to pursue an appeal. (*Burns v. Ohio* (1959) 360 U.S. 252, 255–258; see *Lane v. Brown* (1963) 372 U.S. 477, 478–485 [appeal from denial of *coram nobis*]; see also *Smith v. Bennett* (1961) 365 U.S. 708, 710–714 [habeas corpus petition].)

Evolving Supreme Court jurisprudence has also addressed the practice of incarcerating indigent defendants when fines imposed following a conviction later went unpaid. In *Williams v. Illinois* (1970) 399 U.S. 235 (*Williams*), the high court invalidated a law that indigent defendants, who had already served a maximum term, remain in prison to " 'work off' " any unpaid fines. (*Id.* at p. 236.) *Williams* concluded that "when the aggregate imprisonment exceeds the maximum period fixed by

the statute and results directly from an involuntary nonpayment of a fine or court costs we are confronted with an impermissible discrimination that rests on ability to pay . . . ." (*Id.* at pp. 240–241.) "Since only a convicted person with access to funds can avoid the increased imprisonment, the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum. . . . [T]he result is to make incarceration in excess of the statutory maximum applicable only to those without the requisite resources to satisfy the money portion of the judgment." (*Id.* at p. 242, fn. omitted.) Similarly, *Tate v. Short* (1971) 401 U.S. 395 (*Tate*), involved a defendant who was convicted of an offense for which only a fine was statutorily provided. The Court held he could not be jailed for failure to pay the fine due to indigence. (*Id.* at pp. 397–401.)

*Bearden v. Georgia* (1983) 461 U.S. 660 (*Bearden*) reached a similar conclusion when a revocation of probation was based on a failure to pay fines or restitution due to indigence. *Bearden* observed that "[d]ue process and equal protection principles converge in the Court's analysis in these cases." (*Id.* at p. 665.) "There is no doubt that the State has treated the petitioner differently from a person who did not fail to pay the imposed fine and therefore did not violate probation. To determine whether this differential treatment violates the Equal Protection Clause, one must determine whether, and under what circumstances, a defendant's indigent status may be considered in the decision whether to revoke probation. This is substantially similar to asking directly the due process question of whether and when it is fundamentally unfair or arbitrary for the State to revoke probation when an indigent is unable to pay the fine. Whether analyzed in terms of equal protection or due process, the issue

cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose . . . .' " (*Id.* at pp. 665–667, fns. omitted.)  The high court noted that, under *Williams* and *Tate*, "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it." (*Bearden*, at pp. 667–668.)

The court was careful to contrast the indigent defendant who could not pay with the one who, though able, refused to do so:  "We hold, therefore, that in revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay.  If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority.  If the probationer could not pay despite sufficient bona fide efforts to acquire the resources to do so, the court must consider alternative measures of punishment [for failure to pay] other than imprisonment.  Only if alternative measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay.  To do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine.  Such a deprivation would be contrary to the fundamental fairness

required by the Fourteenth Amendment." (*Bearden*, *supra*, 461 U.S. at pp. 672–673.)

Notably, neither *Williams* nor *Bearden* barred the *imposition* of fines on an indigent defendant in the first instance. The high court recognized the state's legitimate interest in imposing a punitive fine. As *Bearden* observed, "[t]he State, of course, has a fundamental interest in appropriately punishing persons — rich and poor — who violate its criminal laws. A defendant's poverty in no way immunizes him from punishment." (*Bearden*, *supra*, 461 U.S. at p. 669.) Instead the high court cases spoke to the enforcement of payment orders when a defendant lacked the means to later fulfill the obligation. As we discuss in greater depth below, subject to the Eighth Amendment, a court may impose a nonexcessive fine as punishment. What a court may *not* do is punish an indigent defendant solely for nonwillful failure to pay an otherwise properly-imposed fine. *Williams* emphasized that "[t]he State is not powerless to enforce judgments against those financially unable to pay a fine; indeed, a different result would amount to inverse discrimination since it would enable an indigent to avoid both the fine and imprisonment for nonpayment whereas other defendants must always suffer one or the other [upon] conviction." (*Williams*, *supra*, 399 U.S. at p. 244; see *Tate*, *supra*, 401 U.S. at p. 399.)

These cases clarified that, although defendants cannot be jailed solely for a true inability to pay a fine, the obligation can be imposed at the outset and arrangements made to allow for some form of repayment. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056–1057 (*Lowery*).) *Williams* commented that there are "numerous alternatives to which the State by legislative enactment — or judges within the scope of their

authority — may resort in order to avoid imprisoning an indigent beyond the statutory maximum for involuntary nonpayment of a fine or court costs" (*Williams*, *supra*, 399 U.S. at p. 244) and mentioned installment plans or specified work days as examples (*id.* at pp. 244–245, fn. 21). (See *Tate*, *supra*, 401 U.S. at pp. 399–401.) Indeed, these cases made clear that, before ordering imprisonment beyond a statutory maximum term, courts must assess the reason *why* a defendant has failed to pay a fine. *Bearden* emphasized "[t]his distinction, based on the reasons for nonpayment, is of critical importance here." (*Bearden*, *supra*, 461 U.S. at p. 668.) *Bearden* required an evaluation of the reason for nonpayment and permitted additional action, short of imprisonment, for the nonwillful failure to pay a fine. These authorities establish that defendants must be given an opportunity to pay a properly imposed fine and cannot be jailed solely for a nonwillful failure to pay. Defendant's approach is an extension of these precedents to the imposition of fines well before any consequences materialize. (See *Hicks*, *supra*, 40 Cal.App.5th at p. 327; see also *Petri*, *supra*, 45 Cal.App.5th at pp. 91–92; *People v. Adams* (2020) 44 Cal.App.5th 828, 831–832.) We decline to do so.

*People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), relied upon by defendant, does not alter our analysis. Dueñas was a disabled and homeless mother of two and suffered from cerebral palsy. When she could not pay fines and costs that had previously been imposed years earlier for several juvenile

citations, her driver's license was suspended.**15** She was subsequently cited several times for driving on a suspended license. Each new citation resulted in additional payment orders, as well as incarceration, that ultimately totaled 141 days, to "pay off" unpaid fines and fees.**16** (*Dueñas*, at pp. 1160–1161.) Faced with a new citation, Dueñas pled guilty to driving on a suspended license and, as a condition of probation, the court ordered her to pay a minimum $150 restitution fine. (*Id.* at p. 1162.)

In support of its conclusion that an ability to pay hearing must precede the imposition of any *fine, Dueñas* cited *Adams v. Murakami* (1991) 54 Cal.3d 105 for the proposition that " '[t]he principle that a punitive award must be considered in light of the defendant's financial condition is ancient.' " (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1170, quoting *Adams*, at p. 113.) It is important to note, however, that *Adams* involved the imposition

---

**15** As *Dueñas* observed, the law has been amended so that driver's license suspension is no longer permitted as a penalty for unpaid traffic citations. (See Assem. Bill No. 103 (2017–2018 Reg. Sess.); Stats. 2017, ch. 17, §§ 52, 54; Veh. Code, § 13365.2, former subd. (a), former § 40509.5, subd. (b); *Dueñas*, *supra*, 30 Cal.App.5th at p. 1164, fn. 1.)

**16** *Dueñas* described "the cascading consequences of imposing fines and assessments that a defendant cannot pay," stemming from "a series of criminal proceedings driven by, and contributing to, Dueñas's poverty." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1163, 1164.) However, here we have no occasion to address whether the serial imposition of court-ordered financial obligations in successive cases upon one unable to pay them may give rise to a constitutional violation. In particular, we do not speak to situations in which additional penalties, additional time on probation, or governmental resort to wage garnishment are imposed when a person is unable to pay fines or ancillary costs.

of an individually-adjudicated punitive damages award in a civil case. In *that* context, *Adams* observed that "[b]ecause the quintessence of punitive damages is to deter future misconduct by the [civil] defendant, the key question before the reviewing court is whether the amount of damages 'exceeds the level necessary to properly punish and deter,'" which, in turn, required consideration of a civil defendant's financial situation. (*Adams*, *supra*, 54 Cal.3d at p. 110.) By contrast, fines in criminal cases already reflect the Legislature's (or electorate's) determination as to the proper punishment for a given criminal offense. (See *Turnage*, supra, 55 Cal.4th at p. 74; see *Wilkinson*, supra, 33 Cal.4th at p. 838.) *Adams* did not involve criminal fines. As to fines, the high court has "not held that fines must be structured to reflect each person's ability to pay in order to avoid disproportionate burdens. Sentencing judges may, and often do, consider the defendant's ability to pay, but in such circumstances they are guided by sound judicial discretion rather than by constitutional mandate." (*San Antonio Independent School Dist. v. Rodriguez* (1973) 411 U.S. 1, 22; see also *Bearden*, *supra*, 461 U.S. at p. 666, fn. 8.)

Contrary to *Dueñas*'s suggestion, we do not find a due process requirement to hold an ability to pay hearing before imposing every punitive fine.[17] We noted in *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707 that, because due process principles also proscribe excessive fines, in assessing the constitutionality of a fine, it ordinarily "makes no

---

[17] We disapprove the following cases to the extent they are inconsistent with our opinion: *People v. Cowan* (2020) 47 Cal.App.5th 32; *People v. Belloso* (2019) 42 Cal.App.5th 647; *People v. Castellano* (2019) 33 Cal.App.5th 485; *People v. Dueñas*, *supra*, 30 Cal.App.5th 1157.

difference whether we examine the issue as an excessive fine or a violation of due process." (*Id.* at p. 728.) Here we clarify that the excessive fines analysis, which considers ability to pay, is the proper vehicle to challenge punitive fines.

Although fines may properly be imposed as punishment for crime, both the federal and state Constitutions prohibit excessive fines. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) As the United States Supreme Court has observed, the "touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." (*Bajakajian*, *supra*, 524 U.S. at p. 334.) *Bajakajian* adopted "the standard of gross disproportionality articulated in our Cruel and Unusual Punishments Clause precedents" because "judgments about the appropriate punishment for an offense belong in the first instance to the legislature" and "any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise . . . ." (*Id.* at p. 336.)

Defendant did not invoke the excessive fines clauses in the trial court. We remand to give him the opportunity to assert the legal analyses applicable to such a challenge and argue how the particular facts of this case inform such an inquiry. (See *Lowery*, *supra*, 43 Cal.App.5th at pp. 1057–1058; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069–1072; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1039–1041 (conc. opn. of Benke, Acting P. J.).)

Additionally, the trial court did not consider defendant's inability to pay as a *statutory* factor in imposing a restitution fine *above* the minimum amount. (See Pen. Code, § 1202.4,

subds. (c), (d).) Hernandez on remand may seek to contest his inability to pay the amount exceeding the statutory minimum.[18] A court's ruling on ability to pay is reviewed for abuse of discretion. (See *Wilson*, *supra*, 14 Cal.5th at p. 868.) Although we vacate the unpaid balance of the restitution fine as required by Penal Code section 1465.9, subdivision (d), the court must still determine the amount of that fine so it can impose, then stay, the parole revocation fine in a proper amount. Further, the trial court is statutorily required to find defendant has the ability to pay the drug program fee before imposing it. (Health & Saf. Code, § 11372.7, subd. (b).)

## C. *Ancillary Costs*

We turn now to the ancillary costs imposed here, which do implicate equal protection principles. As noted, because we vacate the unpaid balance of the imposed booking fee (Gov. Code, § 6111, subd. (a)), we discuss only two ancillary costs: the court operations and facilities assessments. Defendant argues that imposing these assessments without considering his inability to pay violates equal protection.

The federal Constitution provides that no state may "deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., 14th Amend., § 1.)

---

[18] As noted *ante*, the trial court here expressly stated it was not considering defendant's inability to pay under the mistaken belief such would be determined "at a later date." This circumstance distinguishes this case from those wherein we assumed "the trial court was aware of and fulfilled its statutory duty to consider ability to pay when setting the restitution fine." (*People v. Wilson* (2023) 14 Cal.5th 839, 868 (*Wilson*); see *People v. Ramirez* (2021) 10 Cal.5th 983, 1040–1043; Evid. Code, § 664.)

Like its federal counterpart, the state Constitution provides that a "person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws . . . ." (Cal. Const., art I., § 7.) Although the concepts are closely related, "[d]ue process and equal protection protect different constitutional interests: due process affords individuals a baseline of substantive and procedural rights, whereas equal protection safeguards against the arbitrary denial of benefits to a certain defined class of individuals, even when the due process clause does not require that such benefits be offered." (*People v. McKee* (2010) 47 Cal.4th 1172, 1207.)

"At core, the requirement of equal protection ensures that the government does not treat a group of people unequally without some justification. [Citation.] The extent of justification required to survive equal protection scrutiny in a specific context depends on the nature or effect of the classification at issue. Unequal treatment based on a suspect classification such as race is subject to ' "the most exacting scrutiny." ' [Citation.] So is treatment affecting a fundamental right." (*People v. Chatman* (2018) 4 Cal.5th 277, 288 (*Chatman*).) "But when a statute involves neither a suspect classification nor a fundamental right, the 'general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.' [Citations.] A court applying this standard finds 'a denial of equal protection only if there is no *rational* relationship between a disparity in treatment and some legitimate government purpose.' " (*People v. Hardin* (2024) 15 Cal.5th 834, 847 (*Hardin*).)

"In the past, our cases have set out a two-part inquiry to evaluate equal protection claims. 'We first ask whether the

state adopted a classification affecting two or more groups that are similarly situated in an unequal manner. [Citation.] If we deem the groups at issue similarly situated in all material respects, we consider whether the challenged classification' is adequately justified." (*Hardin, supra*, 15 Cal.5th at p. 848.) However, *Hardin* clarified that when statutes themselves distinguish between identifiable groups or classes and treat them differently, "courts no longer need to ask at the threshold whether the two groups are similarly situated for purposes of the law in question. The only pertinent inquiry is whether the challenged difference in treatment is adequately justified under the applicable standard of review. The burden is on the party challenging the law to show that it is not." (*Id.* at pp. 850–851.) *Hardin* was careful not to cast doubt on the propriety of the "similarly situated" inquiry in other contexts, noting that "[i]n cases that do not involve challenges to classifications appearing on the face of the law, to ask whether a person has been treated differently from another person similarly situated is typically how we determine whether a person has been treated differently on the basis of group membership or another actionable basis." (*Id.* at p. 851.)

With respect to the court operations and facilities assessments, defendant contends he is treated unequally compared to indigent civil litigants because the statutory scheme regarding civil fees allows waivers of similar ancillary costs by those unable to pay them. He argues no rational basis exists for not granting criminal defendants a similar

opportunity to avoid such costs before they are imposed. The Attorney General agrees, and so do we.[19]

At the outset, we observe that the statutory scheme as a whole appears to make facial distinctions between the treatment of ancillary costs in criminal and civil cases, thus obviating the need to show that the two groups are similarly situated. (See *Hardin, supra,* 15 Cal.5th at pp. 850–851.) Both the court operations and facilities assessments must be imposed for every criminal conviction except parking offenses. (See Pen. Code, § 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1).) By contrast, the Legislature, drawing on related due process principles, has enacted a robust fee waiver system in civil cases. It has declared that "California law and court procedures should ensure that court fees are not a barrier to court access for those with insufficient economic means to pay those fees." (Gov. Code, § 68630, subd. (a).) A court may grant an initial fee waiver to qualified applicants, excusing payment of "fees for the first pleading or other paper, and other court fees and costs . . . ." (Gov. Code, § 68631.) An initial fee waiver "shall be granted" to those receiving certain enumerated public benefits, who have monthly income "200 percent or less of the current poverty guidelines," or who otherwise "cannot pay court fees without using moneys that normally would pay for the common necessaries of life for the applicant and the applicant's family." (Gov. Code, § 68632, subds. (a), (b)(1), (c).) The court may grant a partial waiver if it finds a person "can pay a portion of court fees, or can pay court fees over a period of time, or under some

---

[19] Because we agree with defendant's argument on this point, we need not discuss the alternative bases he puts forward in support of his challenge.

other equitable arrangement, without using moneys that normally would pay for the common necessaries of life for the applicant and the applicant's family . . . ." (Gov. Code, § 68632, subd. (c); see Gov. Code, §§ 68633, 68634, 68634.5.) A court may revoke the initial fee waiver if an applicant's financial circumstances have changed or if the court determines the waiver should not have been granted. (Gov. Code, § 68636.) The court may also order the payment of fees if the applicant prevails in her case or obtains a settlement exceeding $10,000. (Gov. Code, § 68637.)

Citing the civil fee waiver scheme, *Dueñas* accurately observed the costs in both contexts involved "fee-generating statutes to raise funds for court operations and facilities . . . ." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1165.) As originally enacted in 2003, former Penal Code section 1465.8 imposed a $20 fee on most criminal convictions "[t]o ensure and maintain adequate funding for court security," with the collected funds to be eventually deposited into the Trial Court Trust Fund. (Pen. Code, former § 1465.8, subds. (a)(1), (d); see Stats. 2003, ch. 159, § 25, p. 1676; *Alford*, *supra*, 42 Cal.4th at p. 756.) As *Alford* noted, the Legislature also enacted a parallel $20 court security fee applicable to civil cases, to be deposited into the same fund. (See Gov. Code, former § 69926.5; Stats. 2003, ch. 159, § 19, p. 1671; *Alford*, at p. 756.) As relevant here, the civil court security fee was later amended and allowed to sunset in the same bill enacting the Uniform Civil Fees and Standard Fee Schedule Act of 2005, which established "a uniform schedule of filing fees and other civil fees for the superior courts throughout the state." (Gov. Code, § 70600; see Stats. 2005, ch. 75, §§ 115, 121, pp. 1551, 1553.) The Legislature declared: "The uniform civil fee structure seeks to eliminate confusion about the proper fee

amounts to be paid, significantly ease the administrative workload in collecting and distributing fees, and provide a small amount of additional funding for important judicial branch functions, including technology infrastructure and court facilities." (Stats. 2005, ch. 75, § 1, subd. (e), p. 1486; see Gov. Code, §§ 70611–70614; see also *Alford*, at p. 757, fn. 4.)

In 2008, Government Code section 70373 was enacted as part of a comprehensive bill establishing the Immediate and Critical Needs Account of the existing State Court Facilities Construction Fund. It provided funds for the "planning, design, construction, rehabilitation, renovation, replacement, or acquisition of court facilities" as well as for certain court leases. (Gov. Code, former § 70371.5, subd. (a); see Stats. 2008, ch. 311, §§ 5, 6.5, pp. 2484–2486, 2488–2489.) One committee report explained the bill allowed issuance of bonds "to finance the construction of critical needs courthouse construction projects, and supports the debt service for the bonds by raising specified criminal and civil fees and fines." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1407 (2007–2008 Reg. Sess.) as amended Aug. 29, 2008, p. 2.) The $30 assessment was to be deposited into the Immediate and Critical Needs Account. (See Gov. Code, former § 70373, subd. (d); Stats. 2008, ch. 311, § 6.5, p. 2489.) In addition, the new law also increased the uniform civil filing fees and directed that a portion of those fees likewise be deposited into the Immediate and Critical Needs Account. (See Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1407 (2007–2008 Reg. Sess.) as amended Aug. 29, 2008, pp. 5–6; Gov. Code, former §§ 68085.3, subd. (c)(2), 68085.4, subd. (c)(2); Stats. 2008, ch. 311, §§ 2, 3.5, pp. 2480, 2483.) Thus, "like the court security fee, the criminal conviction assessment for court facilities was enacted as part of

the budgeting process." (*People v. Castillo* (2010) 182 Cal.App.4th 1410, 1414; see *People v. Phillips* (2010) 186 Cal.App.4th 475, 477–479.) In 2021, the Legislature abolished the Immediate and Critical Needs Account and replaced it with the State Court Facilities Construction Fund. (See Gov. Code, § 70371, subd. (b).) Fees under section 70373 are now deposited into that fund, as are a portion of civil filing fees. (See Gov. Code, §§ 68085.3, subd. (c)(1), 70373, subd. (d).)

This history confirms the Legislature enacted both civil and criminal operations and facilities assessments to raise money for the courts. Enacted together, the provisions were intended to serve the same purposes, and were ultimately deposited into the same fund, yet the Legislature only provided waivers in the civil context. In arguing this differing treatment violates equal protection, both defendant and the Attorney General rely on *James v. Strange* (1972) 407 U.S. 128 (*James*). That case construed "a Kansas recoupment statute, whereby the State may recover in subsequent civil proceedings counsel and other legal defense fees expended for the benefit of indigent defendants." (*Id.* at p. 128.) As relevant here, the statute "strips from indigent defendants the array of protective exemptions Kansas has erected for other civil judgment debtors, including restrictions on the amount of disposable earnings subject to garnishment, protection of the debtor from wage garnishment at times of severe personal or family sickness, and exemption from attachment and execution on a debtor's personal clothing, books, and tools of trade." (*Id.* at p. 135.) Observing that the statute takes away from indigent criminal defendants "the very exemptions designed primarily to benefit debtors of low and marginal incomes" (*id.* at p. 139), *James* concluded the scheme violated equal protection: "We thus recognize that state

recoupment statutes may betoken legitimate state interests. But these interests are not thwarted by requiring more even treatment of indigent criminal defendants with other classes of debtors to whom the statute itself repeatedly makes reference." (*Id.* at p. 141.) *James* reasoned "the Equal Protection Clause 'imposes a requirement of some rationality in the nature of the class singled out.' [Citation.] This requirement is lacking where, as in the instant case, the State has subjected indigent defendants to such discriminatory conditions of repayment." (*Id.* at p. 140.) The high court in *Fuller v. Oregon* (1974) 417 U.S. 40 later distinguished *James*, concluding the Oregon recoupment statute at issue there "retain[ed] all the exemptions accorded other judgment debtors," making the law "wholly free of the kind of discrimination that was held in *James v. Strange* to violate the Equal Protection Clause." (*Fuller*, at pp. 47–48.)

The parties agree the statutory scheme here is akin to that in *James* and fails to withstand rational basis scrutiny. Rational basis review "is necessarily deferential," and "we may not strike down [the Legislature's] enactment under a rational basis standard unless the challengers demonstrate that 'there is no "rational relationship between the disparity of treatment and some legitimate governmental purpose." ' " (*Hardin, supra*, 15 Cal.5th at p. 839.) "Evaluating potential justifications for disparate treatment, a court reviewing a statute under this standard must 'treat the statute's potential logic and assumptions far more permissively than with other standards of constitutional or regulatory review.' [Citation.] 'If a plausible basis exists for the disparity, courts may not second-guess its " 'wisdom, fairness, or logic.' " ' " (*Id.* at p. 852; see *Chatman, supra*, 4 Cal.5th at p. 294.)

The statutory scheme at issue here is similar to the recoupment statute found irrational in *James* and, thus, suffers from the same flaw. The court operations and facilities assessments are ancillary costs intended to raise funds for the courts. A criminal defendant cannot avoid the imposition of these costs regardless of indigence. By contrast, an indigent civil litigant may have similar fees waived entirely. It is true that, under rational basis review, "[t]he underlying rationale for a statutory classification need not have been 'ever actually articulated' by lawmakers, nor 'be empirically substantiated.' " (*Hardin, supra*, 15 Cal.5th at p. 852.) One could theorize that additional costs may arise in criminal contexts. Such considerations might require additional expenditures in criminal facilities and operations. However, this case does not involve *different* costs that may be entailed in criminal rather than civil matters. This case involves the availability of indigency waivers for the same costs imposed in both types of proceedings. Where the Legislature has already determined that both criminal defendants and civil litigants should be charged similar amounts for the same reasons, there appears no rational basis to deny only indigent criminal defendants the ability to avoid those costs. (See *James, supra*, 407 U.S. at pp. 140–142; *People v. Estrada* (2024) 104 Cal.App.5th Supp. 33, 41.)

The present case is unlike those where we have suggested that criminal defendants are not similarly situated to civil litigants. For example, *People v. Guzman* (2019) 8 Cal.5th 673 concluded that a penal statute criminalizing certain forms of eavesdropping was abrogated by Proposition 8's "Right to Truth-in-Evidence" provisions of the state Constitution to the extent the statute required exclusion of evidence obtained in violation

of its terms. (See Cal. Const., art. I, § 28, subd. (f)(2); Pen. Code, § 632, subd. (d).) As relevant here, the *Guzman* defendant resisted this disparity, arguing that allowing exclusion of such evidence in civil, but not criminal, cases would violate equal protection principles. *Guzman* rejected this claim, citing *In re Lance W.* (1985) 37 Cal.3d 873, which reasoned, in connection to a challenge against Proposition 8 (Primary Elec. (June 8, 1982)): "It is constitutionally permissible for the electorate to determine that the public stake in criminal proceedings, and in assuring that all evidence relevant to the guilt of the accused be presented to the trier of fact, justifies the admission of evidence that would be excluded in other proceedings." (*In re Lance W.*, at p. 893.) For purposes of an evidentiary rule of exclusion, *Guzman* reasoned "criminal defendants and civil litigants are not similarly situated and it is 'constitutionally permissible for the electorate' to treat them differently." (*Guzman*, at p. 683.) While the electorate may rationally determine that certain evidence rules may operate differently in criminal and civil contexts, no similar overarching justification exists for denying only indigent criminal defendants an opportunity to avoid ancillary costs imposed on all court users.

Likewise, *People v. Rountree* (2013) 56 Cal.4th 823 rejected the argument that criminal defendants were denied equal protection because "criminal defendants, unlike civil litigants, have no general right to take depositions." (*Id.* at p. 863.) Noting that "civil litigation is entirely different from criminal litigation, and there is no requirement the two systems be similar," *Rountree* reasoned: "Criminal defendants are also not situated similarly to civil litigants. Rather than being treated less favorably than civil litigants, they have many rights not afforded civil litigants, including, for example, the right not

to be deposed. Not giving criminal defendants the right to take depositions does not violate equal protection." (*Ibid*.) No similar differences justify denying criminal defendants the right to seek a waiver of certain ancillary costs when civil litigants facing the same costs may receive such a waiver.

In sum, in light of the Legislature's provision of fee waivers to indigent civil litigants, equal protection principles require a court, upon request, to consider a defendant's inability to pay before imposing a court operations assessment under Penal Code section 1465.8, subdivision (a)(1) or a court facilities assessment under Government Code section 70373, subdivision (a)(1). The court should allow the parties to present and contest any relevant evidence or argument on this question.

### D. *Conclusion*

For clarity, we summarize the status of the various fines and ancillary costs imposed here. With respect to fines:

1. The lab fee under Health and Safety Code section 11372.5, subdivision (a) was properly imposed as required.

2. The drug program fee under Health and Safety Code section 11372.7, subdivision (a) may not be imposed "[i]f the court determines that the person does not have the ability to pay" it. (Health & Saf. Code, § 11372.7, subd. (b).) On remand, the trial court must consider defendant's ability to pay as statutorily required before imposing the fee.

3. Pursuant to Penal Code section 1465.9, subdivision (d), the unpaid balance of the restitution fine under Penal Code section 1202.4, subdivision (b) is now unenforceable due to the lapse of time and shall be vacated.

4. The parole revocation fine under Penal Code section 1202.45, subdivision (a) must be imposed "in the same amount" as the restitution fine. On remand the trial court must consider the appropriate amount of the restitution fine. Although a "defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine" set at the statutory minimum, the court "shall consider" a defendant's inability to pay in setting the amount of the fine in excess of the $300 minimum for felonies. (Pen. Code, § 1202.4, subds. (c), (d).) Once the court determines what the appropriate restitution fine would have been, it should impose the parole revocation fine in that amount, which "shall be suspended unless the person's parole . . . is revoked." (Pen. Code, § 1202.45, subd. (c).)

5. On remand, defendant may challenge the imposition of any fine as constitutionally excessive under the federal and state Constitutions. (See U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.)

With respect to ancillary costs:

6. Pursuant to Government Code section 6111, subdivision (a), the unpaid balance of the booking fee under Government Code section 29550, subdivision (a)(1) is unenforceable and shall be vacated.

7. If requested by defendant, the court must consider defendant's inability to pay before imposing a court operations assessment under Penal Code section 1465.8, subdivision (a)(1), allowing the parties to present any relevant evidence or argument on the matter.

8. Likewise, if requested by defendant, the court must consider defendant's inability to pay before imposing a court

facilities assessment under Government Code section 70373, subdivision (a)(1).

## III. DISPOSITION

The judgment of the Court of Appeal is reversed with directions to remand the matter to the superior court for further proceedings in accordance with this opinion as to the imposition of fines and ancillary costs.  In all other respects, the judgment of the Court of Appeal is affirmed.

**CORRIGAN, J.**

**We Concur:**

**EVANS, Acting C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.***

---

* Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. KOPP

S257844


Concurring Opinion by Justice Liu


I agree with today's opinion that imposing ancillary costs on criminal defendants who lack the ability to pay, while allowing civil litigants to secure fee waivers based on inability to pay, does not comport with equal protection principles. I also agree that a punitive fee may be challenged under the excessive fines clause of the federal Constitution or the cognate clause of the California Constitution.

Today's opinion does not reach several issues that are integral to the instant matter and have arisen in hundreds of cases since we granted review: (1) the constitutionality of Penal Code section 1202.4, subdivision (c), which prohibits consideration of a criminal defendant's inability to pay in imposing the minimum $300 restitution fine (all undesignated statutory references are to the Penal Code); (2) whether the imposition of fines and fees may violate due process or equal protection principles, particularly where the monetary order creates "cascading consequences" that trap a defendant in debt (*People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1163 (*Dueñas*)); and (3) how courts are to evaluate a criminal defendant's ability to pay ancillary costs, including who bears the burden of proof in establishing an inability to pay and whether courts may consider future prison wages in that assessment. I write separately to address these issues.

1

First, section 1202.4, subdivision (b) provides that a minimum $300 restitution fine shall be imposed in "every case where a person is convicted of a crime" unless the court "finds compelling and extraordinary reasons for not doing so and states those reasons on the record." Section 1202.4, subdivision (c), in turn, provides that "[a] defendant's inability to pay [the minimum $300 fine] shall not be considered a compelling and extraordinary reason not to impose a restitution fine."

In *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, we observed that " '[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality.' " (*Id.* at p. 728, quoting *United States v. Bajakajian* (1998) 524 U.S. 321, 334.) Four considerations inform that inquiry: " '(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay.' " (*R.J. Reynolds*, at p. 728, quoting *Bajakajian*, at pp. 337–338; see *Dueñas*, *supra*, 30 Cal.App.5th at p. 1171, fn. 8 ["When deciding if fines are constitutionally disproportionate under the excessive fines clause, one of the four criteria is the defendant's ability to pay."]; cf. *Adams v. Murakami* (1991) 54 Cal.3d 105, 113 ["The principle that a punitive award must be considered in light of the defendant's financial condition is ancient."].) I thus agree with the court in *Dueñas* that because section 1202.4, subsection (c) requires imposition of the minimum restitution fine without regard to a defendant's ability to pay, it is "neither procedurally fair nor reasonably related to any proper legislative goal." (*Dueñas*, at p. 1171, fn. 8; see *ibid.* ["Imposing a restitution fine on 'someone who through no fault of his own is

unable to make restitution will not make restitution suddenly forthcoming,' and the state has no 'legitimate interest in building inescapable debt traps' for indigent residents."], citations omitted.)

Today's opinion does not address this feature of the restitution fine scheme but recognizes that on remand defendant Jason Hernandez can bring an excessive fines challenge to the imposed restitution fine of $10,000. I would hold that in the event the court determines that amount is excessive, the court must then evaluate whether imposing a lesser amount, including the $300 minimum fine, is also excessive. Specifically, if Hernandez contends that he is unable to pay the minimum restitution fine, the court must consider whether it is excessive before imposing it.

Second, apart from any excessive fines challenge, it is a distinct inquiry whether the imposition of punitive fines, coupled with any additional court-ordered monetary obligations, violates due process or equal protection principles. (See *Bearden v. Georgia* (1983) 461 U.S. 660 (*Bearden*); *Griffin v. Illinois* (1956) 351 U.S. 12 (*Griffin*).) Such analysis considers " 'the nature of the individual interest affected [by a sentencing decision], the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose.' " (*Bearden*, at pp. 666–667.)

Analyzing whether a monetary order offends due process or equal protection principles is especially appropriate where a defendant shows that he or she is subject to *additional* monetary obligations based on an inability to pay fines or fees, as well as when a monetary order creates "cascading consequences" that

trap the defendant in debt. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1163.) Unpaid assessments can result in accrual of interest (see, e.g., § 1202.4, subd. (f)(3)(G) [10% annual interest on victim restitution]), and court debt, "along with the attendant court appearances, can lead to loss of employment or shelter, compounding interest, yet more legal action, and an ever-expanding financial burden — a cycle as predictable and counterproductive as it is intractable" (*Rivera v. Orange County Probation Dept.* (9th Cir. 2016) 832 F.3d 1103, 1112, fn. 7).

"Repaying court debt is time-consuming for those with limited finances and prolongs a defendant's involvement with the criminal justice system. Court debt hinders their ability to cover essential costs like food, housing, healthcare, transportation, and family obligations. Debts resulting from imprisonment or license suspension make it difficult to secure employment, housing, or meet child support obligations. Thus, fees and fines imposed on the indigent lead to financial hardship and yield no rehabilitative benefits. [¶] The strain of hardships from debt also burdens indigent defendants and their relationship with family members, exposes them to bad credit, wage garnishment, and indefinite monitoring by the criminal justice system." (Kane et al., *Punished for Poverty: How Fees and Fines Trap the Poor in Perpetual Debt* (2024) 49 Vt. L.Rev. 88, 94, fns. omitted.) Moreover, largely unrecoverable court debt serves no revenue raising purpose, and the costs of attempted collection may even exceed recovery rates. (Cf. Sen. Com. on Budget & Fiscal Rev., Rep. on Assem. Bill No. 1869 (2019–2020 Reg Sess.), at p. 1 ["research on criminal administrative fee collection across California shows that some counties spend equal to or more [on collection efforts for fees] than they actually collect"].)

*Dueñas* demonstrates the appropriateness of applying due process and equal protection analysis in evaluating the constitutionality of any disparity in the harshness of punishment based on poverty. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1161–1162; see *M.L.B. v. S.L.J.* (1996) 519 U.S. 102, 111 ["*Griffin*'s principle has not been confined to cases in which imprisonment is at stake."].) The "cascading consequences" Dueñas suffered from her nonpayment of monetary assessments due to indigency amounted to an inescapable, government-imposed debt trap that included serving time in jail to avoid additional assessments. (*Dueñas*, at pp. 1161–1162; see *id.* at p. 1164 ["[T]his matter 'doesn't stem from one case for which [Dueñas is] not capable of paying the fines and fees,' but from a series of criminal proceedings driven by, and contributing to, Dueñas's poverty."].) Moreover, trapping defendants in compounding debt and revolving jailhouse doors may also offend the Eighth Amendment proportionality principle, particularly where "repeat criminal proceedings [cause] financial obligations to 'snowball.' " (*Id.* at p. 1164.)

*Dueñas* also illustrates the salience of due process and equal protection analysis in addressing discrete features of California law that result in additional punishment based on indigency. Recognizing that Dueñas's unpaid mandatory restitution would prevent her from having her charges dismissed upon completing probation, the Court of Appeal explained that "[i]n this statutory scheme, . . . the wealthy defendant is offered an ultimate outcome that the indigent one will never be able to obtain — the successful completion of all the terms of probation and the resultant absolute right to relief from the conviction, charges, penalties, and disabilities of the offense." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1171.) Following

*Dueñas*, the Legislature enacted Senate Bill No. 1106 (2021–2022 Reg. Sess.), which prohibits a court from denying mandatory or discretionary record cleaning relief based on unpaid restitution. (§§ 17, subd. (f), 1203.4, subd. (c)(3)(C); see *People v. Murphy* (2025) 116 Cal.App.5th 249, 256 ["the purpose of, and the Legislature's goal in enacting, [sections 1203.4, subdivision (c)(3)(C) and 17, subdivision (f)] was to preclude trial courts from relying on the fact of unpaid restitution to deny relief"].)

In this case, the trial court on remand may consider any due process or equal protection challenge to the monetary assessments based on their practical severity in light of Hernandez's ability or inability to pay.

Third, consistent with today's equal protection holding with regard to ancillary costs, I would hold that criminal defendants may obtain automatic fee waivers based on the same criteria as civil litigants. (See Gov. Code, § 68632, subd. (a) [waiver for those receiving public benefits]; *id.*, § 68632, subd. (b) [waiver for those with monthly income below 125% of federal poverty guidelines].) Criminal defendants should be presumed indigent if they receive public benefits, their income is below the federal poverty level, or they are represented by the public defender. For individuals who do not qualify for an automatic fee waiver, they may obtain a waiver upon completing a standard fee waiver packet under penalty of perjury.

Some courts have held that a showing of indigency can be rebutted based on future prison wages. (See, e.g., *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) But the current pay rates for most jobs for incarcerated workers range from 16 cents to 74 cents an hour. (Cal. Code Regs., tit. 15, § 3041.2.)

6

Prisoners, except those who are "indigent," must often purchase basic items like toothpaste, soap, tampons, writing materials, and stamps from the commissary. (*Id.*, § 3000 [an incarcerated person is "indigent" if they maintain trust account balance of $25 or less for 30 consecutive days]; see *Keenan v. Hall* (9th Cir. 1996) 83 F.3d 1083, 1091 ["Indigent inmates have the right to personal hygiene supplies such as toothbrushes and soap."]; see also Cal. Code Regs., tit. 15, § 1265 [at local detention facilities, indigent persons who are detained for over 24 hours shall be issued basic items such as a toothbrush, soap, comb, and sanitary napkins].) In addition, the state may be able to deduct money for medical co-pays, costs of incarceration fees, and disciplinary fines from inmate trust accounts. (See VanCleave, *Prison Banking* (2024) 112 Cal. L.Rev. 1699, 1717.)

Further, to assume that a defendant can earn prison wages ignores the reality that paid jobs may not be available. (Cal. Code Regs., tit. 15, § 3040, subd. (k) ["An incarcerated person's assignment to a paid position is a privilege dependent on available funding, job performance, seniority and conduct. These factors shall be criteria considered in determining an incarcerated person's eligibility for pay earning status and rate of pay."]; see *In re Player* (2007) 146 Cal.App.4th 813, 824 ["The available programs for work and education vary from prison to prison."], disapproved on other grounds in *In re Jenkins* (2010) 50 Cal.4th 1167, 1182.) Courts should not indulge speculative or unrealistic notions of future wage-earning opportunities when assessing a defendant's ability to pay fines or fees.

Because these critical issues will likely result in differing approaches in the lower courts and disparities in treatment of indigent criminal defendants throughout the state, I join the court in urging the Legislature to consider further reforms

guided by a basic corollary to the principle of equal justice under law:  While a defendant's poverty does not make him any *less* subject to punishment for violating the law, our justice system must not punish a defendant *more* harshly simply because he is poor.

**LIU, J.**

**I Concur:**
**EVANS, Acting C. J.**

PEOPLE v. KOPP

S257844


Concurring and Dissenting Opinion by Justice Rothschild


The majority holds that equal protection grants indigent criminal defendants the right to a waiver of postconviction assessments because indigent civil litigants have a right to a waiver of filing fees. I disagree.

"[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.' [Citations.]" (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 315; see *People v. Hardin* (2024) 15 Cal.5th 834, 851.) Here, the majority has not met that burden.

The majority reasons that because the purpose of both assessments and filing fees is to support court operations, criminal defendants and civil litigants are similarly situated. The majority then concludes that no rational basis exists to deny indigent criminal defendants the right to a waiver of postconviction assessments. (See maj. opn. *ante*, at p. 34.) In coming to that conclusion, the majority ignores a rational basis for the different treatment of postconviction assessments and civil filing fees. Waiving filing fees for indigent civil litigants is a rational legislative response to the due process requirement to afford them access to the courts. (See maj. opn. *ante*, at p. 29, quoting Gov. Code, § 68630, subd. (a).) But unlike civil filing fees, postconviction assessments "do[ ] not deny a criminal defendant access to the courts." (*People v. Hicks* (2019) 40

1

Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946.) And postconviction assessments are a rational legislative response to the increased costs of court operations and facilities associated with criminal trials. Also, unlike civil filing fees, which must be paid or waived at the time of filing, if defendants cannot pay at the time of assessment, they may be able to pay in the future. (See *People v. Cowan* (2020) 47 Cal.App.5th 32, 49, review granted June 17, 2020, S261952; *People v. Santos* (2019) 38 Cal.App.5th 923, 934.)

For the foregoing reasons, there is a rational basis for treating criminal and civil litigants differently in this context. Indeed, the courts of other states that have considered analogous issues are in accord. (See *State v. Mathers* (Wash.Ct.App. 2016) 376 P.3d 1163, 1169–1170; *Martinez v. State* (Tex.Ct.App. 2016) 507 S.W.3d 914, 917–918; *People v. Konopka* (Mich.Ct.App. 2015) 869 N.W.2d 651, 666; *People v. Barnes* (N.Y. 1984) 465 N.E.2d 35, 35.) Further, the majority's heavy reliance on *James v. Strange* (1972) 407 U.S. 128 is misplaced because the rationale supporting the differing treatment here — namely, the need to protect indigent civil litigants' access to the courts — was absent in that case. (See *id.* at p. 139; see also *United States v. Smith* (9th Cir. 1987) 818 F.2d 687, 692 [distinguishing *James* and holding that a criminal conviction assessment that raised revenue to fund programs for crime victims did not violate equal protection].)

I therefore conclude that imposition of the assessments without determining the defendant's ability to pay does not violate equal protection principles. Accordingly, I respectfully dissent from the majority's contrary holding on this point. I otherwise concur in the court's opinion.

**ROTHSCHILD, J.**[*]

---

[*] Presiding Justice of the Court of Appeal, Second Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Kopp

---

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 38 Cal.App.5th 47
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S257844
**Date Filed:**  December 29, 2025

---

**Court:**  Superior
**County:**  San Diego
**Judge:**  Harry M. Elias

---

**Counsel:**

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Christi J. Kopp.

Rebecca P. Jones, under appointment by the Supreme Court, for Defendant and Appellant Jason Samuel Hernandez.

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, A. Howard Matz, Dorothy Wolpert and Cameron Partovi for the Beverly Hills Bar Association, the Los Angeles County Bar Association and the Bar Association of San Francisco as Amici Curiae on behalf of Defendant and Appellant Jason Samuel Hernandez.

Brandon Greene; and Asher Waite-Jones for the American Civil Liberties Union Foundation of Northern California, East Bay Community Law Center, Contra Costa Public Defenders Office, California Public Defenders Association, San Francisco Public Defender's Office and the Office of the State Public Defender as Amici Curiae on behalf of Defendants and Appellants.

Jesselyn Friley, Kathryn Eidmann, Mark D. Rosenbaum and Molly Mauck for Public Counsel, Western Center on Law and Poverty, Fines and Fees Justice Center, Center for Responsible Lending, Community Legal Services in East Palo Alto, The Insight Center and Legal Services for Prisoners with Children as Amici Curiae on behalf of Defendants and Appellants.

Clare Pastore; American Civil Liberties Union Foundation of San Diego and Imperial Counties, David Loy; American Civil Liberties Union Foundation of Southern California, Michael Kaufman and Adrienna Wong for Poverty Law Scholars as Amici Curiae on behalf of Defendants and Appellants.

Stacey Tutt, Claire Johnson Raba; and Tifanei Ressl-Moyer for the University of California, Irvine School of Law Consumer Law Clinic, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, The United CORE Alliance, All of Us or None, Legal Services for Prisoners with Children, Legal Services of Northern California, Justice2Jobs Coalition, National Association for the Advancement of Colored People, Western Regional Advocacy Project and GLIDE as Amici Curiae on behalf of Defendants and Appellants.

Xavier Becerra and Rob Bonta, Attorneys General, Michael J. Mongan, State Solicitor General, Lance E. Winters, Chief Assistant Attorney General, Janill L. Richards, Principal Deputy State Solicitor General, Julie L. Garland, Assistant Attorney General, Joshua A. Klein, Deputy State Solicitor General, A. Natasha Cortina, Melissa Mandel and Adrian R. Contreras, Deputy Attorneys General, and Amari L. Hammonds, Associate Deputy State Solicitor General, for Plaintiff and Respondent.

Perkins Coie, Carrie Akinaka and Charles Sipos for Beth A. Colgan as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Rebecca P. Jones
Attorney at Law
3549 Camino del Rio South, Suite D
San Diego, CA 92108
(619) 269-7872

Molly Mauck
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977

Joshua A. Klein
Deputy State Solicitor General
1515 Clay Street, Suite 2000
Oakland, CA 94612
(510) 879-0756